## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **LILY ROBOTICS, INC.,** | Case No. 17-10426 (____) |
| Debtor.[1] | |

## DECLARATION OF CURTIS G. SOLSVIG III IN SUPPORT OF
## DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY RELIEF

I, Curtis G. Solsvig III, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am a Managing Director at Goldin Associates, LLC ("Goldin").[2]  On January 25, 2017, Lily Robotics, Inc., a Delaware Corporation, retained Goldin as financial advisor to assist in preparation for a wind-down of the Debtor's business.  Subsequently, on February 26, 2017, the Debtor hired me as Chief Restructuring Officer, subject to Court approval in this chapter 11 case.  In my capacity as a financial advisor and Chief Restructuring Officer of the Debtor (subject to Court approval), I am familiar with the Debtor's day-to-day operations, books and records, business, and financial affairs.

2.      I submit this Declaration in support of the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code and pleadings filed on the date hereof seeking various types of "first day" relief, and to provide an overview of the Debtor's business

---

[1]     The last four digits of the Debtor's federal tax identification number are 8604. The Debtor's headquarters and mailing address is 374 Harriet Street, San Francisco, California 94103.

[2]     Information on my qualifications can be found in the *Debtor's Motion for an Order, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, Authorizing the Debtor to Retain Goldin Associates, LLC to Provide Chief Restructuring Officer and Related Services* Nunc Pro Tunc *to the Petition Date, and Approving the Agreement Related Thereto*, dated the same day hereof (the "Goldin Application").

and its need for restructuring under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.       Except as otherwise indicated, the facts set forth in this Declaration are based on my personal knowledge of the Debtor's business, employees, operations, and finances; information learned from my review of relevant documents; my discussions with other members of the Debtor's senior management and other professionals; information provided to me by the Debtor's employees; or my opinion based upon experience, knowledge, and information concerning the Debtor's operations and financial condition.  If called upon to testify, I would and could testify competently to the facts set forth in this Declaration and the First Day Motions.  I am authorized to submit this Declaration on the Debtor's behalf.

## I.       PRELIMINARY STATEMENT

4.       In 2013, two UC Berkeley students, like many before them in Silicon Valley, came up with a visionary idea:  an autonomous flying drone that could capture photos and videos; the camera would be waterproof, capable of being launched with a throw, and able to navigate itself around subjects while recording.  They wanted the "Lily Camera"—the name of the flagship product—to "capture life from new heights."  But the founders had little more than an idea and early prototype.

5.       The founders set out to turn their idea into a business.  First, they needed funding.  The founders put up their own cash initially to jumpstart development of the camera and give birth to the Debtor.  The following year, the Debtor received $1.1 million in seed funding from a group of angel investors.  With that money, they could build the product and the business, and bring their idea to reality.

6.      In early 2015, excited by the product's potential, the Debtor launched a pre-order campaign for the Lily Camera.  The Debtor took in $34.8 million in pre-sales from more than 60,000 customers, vastly exceeding their projections.

7.      Now the Debtor had what every Silicon Valley startup wants: buzz.  The Lily Camera was named a gadget "that will change your life in 2016" by The Wall Street Journal.



The Wall Street Journal Article from December 2015 featuring the Lily Camera

8.      With so many expectant customers, so much hype, and so little experience, the pressure mounted.  To fund the ramp-up, the Debtor raised $13.8 million in venture equity financing from a well-respected group of venture investors led by Spark Capital (with investors including NFL Hall of Famer Joe Montana) in the Summer of 2015.  The Debtor worked to create the product that the founders envisioned and the product that customers wanted.  In the Summer of 2015, they enlisted a Chinese vendor, GoerTek, to help them build the product.  GoerTek and the Debtor went through months of models and alterations trying to get it right.

Over many months and multiple iterations, each prototype had problematic flaws that prevented the Debtor from delivering the camera to the market.

9.     As the process dragged on, the Debtor had to return to the financing market.  It secured another $4 million in senior secured financing from SVP Financial Group in December of 2015.

10.     By the end of 2016, the Debtor still had not perfected the product; the financing market had dried up, and the Debtor started to explore strategic alternatives.  It sought a buyer in the Fall of 2016, but that market evaporated quickly too.

11.     In December 2016, the Debtor realized it had run out of time and had to wind down the company.  Compounding the problems, on January 11, 2017, the District Attorney for the City and County of San Francisco commenced an action in the Superior Court of the State of California City and County of San Francisco, asserting claims arising from the Debtor's failure to deliver the Lily Camera.  The Debtor then appointed an independent director to look at orderly wind-down options.  The Board's special committee, led by the independent director, engaged Goldin to advise on wind-down options, engaged bankruptcy counsel from Orrick and soon made the decision that a bankruptcy would be the best way to wind down the company.

12.     The Debtor hopes to seek several forms of relief in chapter 11.  First, the Debtor will seek to refund all the segregated customer cash as soon as possible—with the Court's approval.  The Debtor wants to ensure no customers are harmed in this process.

13.     Second, the Debtor will use this case to pursue an auction of its intellectual property, to complete a sale transaction, and to wind down its estate in an orderly fashion—while maintaining the continued operation to facilitate customer refunds—in an effort to maximize the value of the Debtor's business and assets for the benefit of all stakeholders.

14.     Third, the Debtor will rely on the automatic stay to suspend the pending litigation in California.  This will give the Debtor breathing room to wind down its affairs without the threat of state intervention.

15.     Finally, the Debtor intends to seek a wind-down plan to distribute its remaining assets to creditors after a sale process is complete.  This will ensure maximum and fair recoveries for the various creditor classes.

## II.    THE DEBTOR

### A.    Corporate Summary

16.     The Debtor has its headquarters and sole location in San Francisco, which handled sales, customer support and research and software development.  The Debtor is in the process of winding down operations at the headquarters office.  The Debtor has no subsidiaries or corporate affiliates.

### B.    The Birth and Growth of the Debtor

17.     Two students from University of California, Berkeley founded the Debtor in 2013 with the goal of developing a fully autonomous flying camera.  The founders self-funded the early stages of their operations with approximately $30,000.

18.     In 2014, the Debtor secured approximately $1.1 million in seed financing, led by Shana Fisher and including investors SV Angel, Upside Partnership, Slow Ventures, and Kevin Mahaffey.  The seed investors purchased convertible notes.[3]  With financing in hand, the Debtor began to grow its team and the business.

19.     Although the product was still in early prototype, there were five employees, and the Debtor had approximately $200,000 in cash, the Debtor launched a pre-order campaign of its flagship product, the Lily Camera, in May of 2015.  The Debtor initially projected fewer than

---

[3]     The convertible notes all matured as of March 10, 2016.

5,000 pre-orders, but the campaign generated approximately $38.4 million[4] in pre-orders from

61,450 customers.  About half of the total pre-orders came from outside the United States, with

orders from more than 80 countries.

20.     The Lily Camera ended up generating significant attention—even making an

appearance in the *The Wall Street Journal.*  Geoffrey A. Fowler and Joanna Stern, *The Tech That*

*Will Change Your Life in 2016*, WALL STREET J. (Dec. 27, 2015),

https://www.wsj.com/articles/the-tech-that-will-change-your-life-in-2016-1451409261.

21.     The Debtor set the initial shipment date of the Lily Camera for February of 2016.

Because of the unexpectedly high demand, the project became more challenging.  The Debtor

needed to secure additional financing, hire more employees and find a manufacturer to assist in

executing development of the Lily Camera and fulfilling the pre-orders.

22.     In the Summer of 2015, the Debtor closed a financing round of approximately

$13.8 million, led by Spark Capital.  Other investors in this round included Stanford StartX, the

House Fund, Seven Seas Capital, DJ Steve Aoki, and former San Francisco 49ers quarterback,

Joe Montana.  The investors purchased shares of Series A Preferred Stock (discussed in more

detail below at paragraph III.50).  Bijan Sabet, General Partner of Spark Capital, joined the

Debtor's Board of Directors on August 3, 2015.

23.     Following this investment, the Debtor moved to a new facility in San Francisco.

The Debtor also hired Doug Chan as Chief Manufacturing Officer during this time period.  Mr.

Chan had significant experience in manufacturing from his time at companies such as Cisco,

Dropcam, and Google, and the Debtor expected Mr. Chan to help drive completion of the

camera.  By August of 2015, the Debtor had 21 full-time employees.

---

[4]   For details on the Debtor's cash flow and accounting, see discussion on "Cash and Customer
     Refunds" in Section V.

**C.**    **The Debtor Struggles to Execute the Lily Camera**

24.    Under the direction of Mr. Chan, the Debtor engaged Weifang GoerTek

Electronics Co., Ltd., a contract manufacturer headquartered in Weifang, China, to produce and

manufacture the Lily Camera.  Mr. Chan had previously worked with the GoerTek engineering

team at another company and vouched for its experience in optical engineering and

manufacturing.

25.    The Debtor and GoerTek began working collaboratively on the Lily Camera; the

Debtor developed the software and oversaw the electrical and mechanical engineering of the

product while GoerTek assisted with developing and executing the Debtor's innovations.

26.    The Debtor had no contractual relationship with GoerTek; instead, the parties

signed a Letter of Understanding in the Summer of 2015 and continued to work without

contractual guidelines. Over the course of its working relationship, the Debtor paid GoerTek

over $1.6 million for work performed.

27.    In the Fall of 2015, the Debtor and GoerTek began the process of developing the

prototype into a mass-production model that met the Lily Camera specifications while still being

capable of high-volume production.  This was an iterative process in which GoerTek built

prototypes, the Debtor and GoerTek tested them, identified problems and necessary

improvements, developed solutions, and built new, improved prototypes.  However, in a process

like this, it can be difficult to "see around the corner."  Only after one set of problems has been

solved (or as a result of the solution) does the next set of problems present themselves.  As a

result, it may seem that the product is one or two iterations from being ready, but then new

problems appear, and another round of the process begins.

28.    Following several iterations of this process, the models still showed a wide range

of problems and required the necessary improvements.  The Debtor's management team

determined that it would not be able to meet the February 2016 delivery target and on December 17, 2015, announced a delay in deliveries to late 2016.


Lily Camera prototype from GoerTek - November 2015

29.    At this point, the Debtor had more than 30 employees, a monthly cash burn rate around $1,000,000, and approximately $8,000,000 in cash.  Management came to the conclusion that it would be prudent to raise additional cash as a cushion in the event the development process took longer than they expected.  They obtained $4 million in senior secured first lien financing from SVB Financial Group on December 14, 2015 (as detailed in Section III.47 below).

30.    In February of 2016, the Debtor conducted testing of the next round of units delivered from GoerTek.  The test results were encouraging; the Debtor believed that it had resolved the major issues and that the next production run would deliver a product meeting specifications.

31.    However, in April and August of 2016, GoerTek delivered new rounds of test units that failed to meet the Debtor's performance specifications as new, unforeseen problems emerged.  Although the Debtor had solved major issues with the product, smaller issues needed

attention.  Recognizing that the revised delivery date of late 2016 was unrealistic, on August 25, the Debtor announced initial deliveries would be postponed to early 2017.

32.    Management also took several initiatives to enhance performance and reduce costs.  The Debtor hired additional resources in Engineering and Operations management, while dramatically downsizing its workforce from 69 employees at the peak in June 2016 to 41 employees in August 2016.

33.    Through the Fall of 2016 the Debtor continued developing the test units, working closely with GoerTek.  However, problems continued to plague the product and the Debtor could not finalize a design capable of delivering the promised performance.



Lily Camera prototype from GoerTek – October 2016

34.    In parallel, recognizing that they might run out of money before launch, management began to explore fund-raising options in June 2016.  The Debtor discussed financing with a range of financial and industry parties.  The Debtor hired a financial advisor to explore possible M&A options.  Several parties indicated interest; discussions progressed with one buyer to an advanced stage with draft term sheets in December 2016.  Recognizing the potential of this transaction to preserve value and allow the Debtor to survive, several of the

venture capital funds, including Spark Capital, injected approximately $900,000 into the Debtor in December of 2016.

35.     In late December, management realized the unlikelihood of consummating a transaction in an appropriate time frame and made the decision to wind down operations.  On December 16, 2016, Bijan Sabet of Spark Capital resigned his seat from the Board.  The Company began discussions with its external refund vendors, Tilt and Stripe, on or about December 21, 2016, in connection with initiating mass refunds of the pre-order funds to customers.

36.     In late December, management announced to its staff that it was going to wind down the company and that the employees would be terminated.  On January 10, 2017, the Debtor made a public announcement of its intention to wind down the Debtor and refund the remaining customer pre-order funds.

**D.     Underline(District Attorney Initiates Litigation)**

37.     On January 11, 2017, the District Attorney for the City and County of San Francisco commenced an action in the Superior Court of the State of California, City and County of San Francisco, entitled *People of the State of California v. Lily Robotics, Inc. et al.*, Case No. [CGC-17-556365], asserting claims for unfair business practices and misrepresentation.

38.     The Complaint seeks a permanent injunction as well as imposition of civil penalties, restitution, and other relief for alleged violations of California Business & Professions Code Sections 17200 and 17500 *et seq*.  The Superior Court of California, San Francisco Division heard argument on the District Attorney's motion for a temporary restraining order on January 12, 2017, and granted a modified version of the requested order.  On January 18, 2017, the parties stipulated to a continued modified temporary restraining order.

39.     The San Francisco District Attorney amended its Complaint on February 2, 2017 to include the Debtor's cofounders as individual defendants.  On February 23, 2017, the Court signed a stipulated preliminary injunction negotiated by the parties.  Through that stipulation, the Debtor agreed to certain restrictions on its use of customer deposits not yet refunded and the provision of periodic financial updates to the San Francisco District Attorney.

## E.     The Winddown

40.     Because management had little experience with restructuring and because of the potential litigation liabilities, the Board began a process to retain an independent director and financial advisor/chief restructuring officer.  The Debtor interviewed six candidates for one or both of those roles.  On January 24, 2017, the Board selected Spencer Wells, a Partner at Drivetrain Advisors, to serve as Independent Director.

41.     Mr. Wells currently serves as a director for many companies, including Roust Corporation, Vantage Drilling International and Affinion Group, Inc., and formerly served as a director for Syncora Holdings Ltd.  The Debtor engaged Mr. Wells to serve as an independent director to help advise with respect to potential restructuring and other matters.

42.     Shortly thereafter, the Board created a Special Committee to explore wind-down options and appointed Mr. Wells as the sole member of the Special Committee, with full authority to implement and oversee a wind-down procedure—potentially including bankruptcy.  Mr. Wells has subsequently overseen preparations for filing for bankruptcy, including the selection of a CRO.

43.     Immediately after his retention, Mr. Wells interviewed two of the original candidates as well as two additional candidates in an effort to fill quickly the financial advisor/chief restructuring officer role.  On January 25, 2017, the Special Committee adopted a resolution naming me as Financial Advisor.  Mr. Wells and I also discussed the prospect of my

serving as CRO in the event of a petition for bankruptcy, under certain circumstances and subject to further written agreement.  On February 26, 2017, Goldin and the Company entered into an amendment to their engagement agreement pursuant to which I accepted the role of CRO, subject to Court approval, *nunc pro tunc*, to the Petition Date.  A copy of the original engagement agreement between Goldin and the Debtor and the first amendment thereto, are attached to the Goldin Application as <u>Exhibit B</u>.

44.     Mr. Wells and I have worked with Debtor's proposed bankruptcy counsel for the last four weeks preparing for a bankruptcy, seeking asset purchasers and organizing the reconciliation of customer pre-orders and cash.  In this process, all remaining employees, except for the founders, have been terminated or left and the services of an accounting firm have been engaged to provide day-to-day finance, accounting, and reporting services.  The process of disposition of the furniture, fixtures, and equipment in the company offices has progressed.  To date, this has generated approximately $63,000.

45.     On February 20, 2017, the Special Committee elected to file for bankruptcy protection.

**F.     Recent Financial Performance/Balance Sheet**

46.     The Debtor's balance sheet as of December 31, 2016, lists (a) assets of $32,995,584.66, which includes $25,660,972.52 in cash and $4,274,323.73 in receivables, (b) liabilities of $37,531,815.00 which include $585,077.37 in payables, $29,370,486.80 in deferred revenue and $3,863,495.32  in long-term liabilities (including amounts owed to SVB under the Term Loan; and (c) total capital, including stockholder equity, of negative $4,536,230.34.  A summary of the balance sheet as of December 31, 2016, follows:

|  | Dec. 31, 2016 |  |
|---|---|---|
| **ASSETS** |  |  |
| **Current Assets** |  |  |
| **Checking/Savings** | 25,660,972.52 |  |
| **Accounts Receivable** | 4,274,323.73 |  |
| **Total Other Current Assets** | 1,080,429.58 |  |
| **Total Current Assets** |  | 31,015,725.83 |
| **Fixed Assets** |  | 1,371,193.84 |
| **Total Other Assets** |  | 608,664.99 |
| **TOTAL ASSETS** |  | **32,995,584.66** |
|  |  |  |
| **LIABILITIES & EQUITY** |  |  |
| **Liabilities** |  |  |
| **Current Liabilities** |  |  |
| **Total Accounts Payable** | 585,077.37 |  |
| **Other Current Liabilities** |  |  |
| **Deferred Revenue, Tax, Shipping** | 29,370,486.80 |  |
| **Short Term Capital Lease** | 21,931.25 |  |
| **Short Term Deferred Rent** | 37,388.31 |  |
| **Short Term Loan** | 1,333,333.33 |  |
| **Accrued Liabilities** | 2,320,102.62 |  |
| **Total Current Liabilities** |  | 33,668,319.68 |
| **Long Term Liabilities** |  |  |
| **Long Term Deferred Rent** | 231,665.90 |  |
| **Note Payable** | 3,576,666.67 |  |
| **Long Term Capital Lease** | 55,162.75 |  |
| **Total Long Term Liabilities** |  | 3,863,495.32 |
| **Total Liabilities** |  | **37,531,815.00** |
| **Equity** |  |  |
| **Retained Earnings** |  | -6,723,321.02 |
| **Stock** |  |  |
| **Common Stock** | 389,257.59 |  |
| **Series A Stock** | 14,999,911.78 |  |
| **Series A Stock Cost** | -176,577.20 |  |
| **Total · Stock** |  | 15,212,592.17 |
| **Net Income** |  | -13,025,501.49 |
| **Total Equity** |  | -4,536,230.34 |
| **TOTAL LIABILITIES & EQUITY** |  | **32,995,584.66** |

13

### III.    CAPITAL STRUCTURE

47.    *Secured Debt.* The Debtor's only secured creditor is SVB Financial Group.  On December 14, 2015, SVB and the Debtor entered into a Loan and Security Agreement.  The Debtor granted to SVB a security interest in substantially all of the Debtor's assets, except for intellectual property but including the proceeds of intellectual property, as security for the Debtor's obligations under and as defined in the Loan Documents to SVB.  The Debtor was indebted to SVB in the approximate amount of $3,777,777.78 under a 36-month term loan which matures in November of 2019, plus interest and allowable costs and fees.  Immediately prior to the Petition Date, Spark Capital purchased this claim from SVB as part of an effort to support the orderly wind down of the Debtor, including the return of customer deposits and the sale of assets.

48.    A recent lien search confirms that SVB is the only entity that has filed an UCC-1 financing statement[5] and that there are no other liens and security interests on the Company's pre-petition property.[6]  The Debtor believes that the Loan Documents executed and delivered by the Debtor to SVB are valid, binding, and enforceable in accordance with their terms by SVB against the Debtor.[7]  SVB duly and validly perfected its liens upon and security interests in the prepetition collateral by, among other things, filing financing statements, entering into deposit account control agreements and, where necessary, possessing the relevant instruments,

---

[5]    The lien search shows SVB recorded a lien on substantially all the Debtor's assets. The collateral does not include the Debtor's intellectual property but it does include all accounts, license and royalty fees, and other revenues, proceeds, or income arising out of the intellectual property.

[6]    Note that there were also two liens filed in California relating to two printers used by the Debtor at its San Francisco office.

[7]    The Debtor understands that as part of the acquisition of the SVB debt, Spark Capital, as the Prepetition Secured Lender (as defined below) will be filing a UCC-3 shortly to reflect the assignment

certificates, or other property. All of such financing statements were validly authorized by authorized representatives of the Debtor.

49.     Other than indebtedness under the term loan, the Debtor's liabilities (exclusive of customer claims) are comprised of general unsecured claims approximating $12.5 million (with GoerTek holding the largest claim of about $12 million), all of which are subject to contingencies or dispute, and the unliquidated, disputed and contingent claim stemming from the Litigation, as set forth on the Debtor's *Schedule F*, which will be filed in this chapter 11 case.

50.     *Equity Interests.* The Debtor has 26 preferred equity holders and 14 common stock equity holders. As of the Petition Date, the Debtor has 736,629 shares of preferred stock and 3,521,225 shares of common stock issued and outstanding. In addition, as of the Petition Date, the Debtor has issued options to acquire in the aggregate 396,316 shares of the Debtor's common stock. SVB holds 10,000 common stock warrants.

### IV.    THE DEBTOR DEVELOPS STRONG IP PORTFOLIO

51.     While the Debtor struggled to develop a mass-production model, it succeeded in developing a portfolio of intellectual property.  The portfolio includes:

- "**Takeoff from Throw**" Patent: This patent provides for a unique feature allowing the user to throw a quadcopter (a multirotor helicopter; the design used in drones) in the air in order to initiate a flight. The propellers begin without power, and spin up in mid-air.

-  "**Multi-Stream User Tracking**" Patent: This patent describes a fusion of sensors including computer vision, GPS and inertial sensors to form an accurate and reliable tracking estimate of the user.

- "**Land in Hand**" Patent: This patent details a flight landing sequence for an unmanned aerial vehicle into the hand of the operator. This has a large impact on the user experience of the device, as it simplifies the landing procedure. Typically, the user needs to locate soft flat ground in order to land. This feature allows the user to quickly land the device over any terrain.

- "**Localized Sound on Tracking Device**" Patent: This utility patent is for an external microphone placed away from the flying device (for example, on the user), allowing for clean audio in the final output. Other flying cameras either do not have a microphone (and therefore silent content), or have a microphone on board the flying device (and therefore have significant noise from propellers).

- "**Automatic Video Editing Using Sensor Data**" Patent: This technology utilizes sensor data, time synchronized with a camera, from a location in the video field of view. The algorithm uses this data to automatically edit video into compositions with synchronized music. This can be done without any user interaction or prompting.

- **Design Patents for Drones and Tracking Device**.

52.     The Debtor holds a variety of trademarks and has developed proprietary software and hardware related to the flagship product.

## V.     CASH & CUSTOMER REFUNDS

53.     As mentioned above, the Debtor generated approximately $38.4 million from 61,450 customers from its pre-order campaign.

54.     The Debtor outsourced payment processing for pre-orders in a two-step sequence that used two intermediaries.  The first intermediary, Tilt, took the customer information.  Tilt is a crowdfunding website that allows groups and communities to collect, fundraise, or pool money online

55.     Initially, Balanced served as the second intermediary for the first month of pre-orders.  Balanced, a third-party payment platform, processed the credit card transactions and coordinated the Debtor's receipt of the funds.  After Balanced went out of business in June 2015, Stripe filled the intermediary role.

56.     Stripe is a technology platform that helps merchants accept payments online. Stripe's merchants' card charges are cleared through the card networks and briefly held in an omnibus account held at Wells Fargo Bank N.A. for the benefit of Stripe merchants before the

processed amount is distributed to the individual merchant's bank account. Accordingly, Stripe coordinated receipt of funds from the card networks to the Debtor's bank account.

57.     All pre-orders started with the customer on the Debtor website clicking an icon indicating that they wanted to order a Lily Camera. When they did so, the website directed the customer to another window hosted by Tilt (but with the Debtor's branding and graphics). On this screen, the customer entered their name, email address, country and mailing code, and credit card information. Upon acceptance, Tilt transferred the data to Balanced or Stripe. Balanced and Stripe coordinated processing of the charge and payment to Debtor through Tilt.

58.     When Balanced wound down, it transferred its data and the balance of customer pre-order funds to Tilt. Tilt has represented to me that it has fully reviewed the data from Balanced and it reconciles completely to their data.

59.     Stripe maintained its own database for Tilt customers, including the Debtor. Consistent with applicable law, Stripe has shared the information in this database with the Debtor and Tilt, and Tilt is in the process of reconciling the information from the Stripe database to their data.

60.     In May and June 2015, Balanced transferred approximately $14.9 million to Tilt, which Tilt transferred on to the Debtor. During July and August 2015, Stripe transferred approximately $11.6 million to Tilt, which Tilt transferred on to the Debtor. In September 2016, Tilt transferred an additional approximately $574,000 to the Debtor. In total, the Debtor received approximately $27 million in customer pre-order cash.

61.     To fund customer pre-order refunds, the Debtor transferred approximately $3.9 million to Tilt over the period August 2016 to January 2017. Also to fund customer pre-order refunds, the Debtor transferred approximately $16.5 million to Stripe in January 2017.

Approximately $6.6 million remains in a segregated Debtor account at SVB. Subject to final verification, I believe this accounts for all of the customer funds in the Debtor's hands since May 2015.

62.     Customer refunds began almost immediately after pre-order sales started. For example, we understand from Tilt that there were approximately $236,000 worth of refunds by Balanced in May 2015 when pre-order sales started. Since then, refund requests have continued. They accelerated after the first announced delay in December 2015 and again after the second announced delay in August 2016.

63.     Whenever possible, refunds were handled by a direct refund to the credit card used in the original transaction. However, in some instances, the card had expired or been cancelled, or the credit card company refused to handle the refund on a transaction which had occurred too far in the past. In these instances, a refund was made by either a payment through PayPal or by cutting a manual check. It is my understanding that, until late December 2016, Stripe handled refund requests for customers whose pre-order it had processed and that, after Balanced closed, Tilt handled refund requests for customers whose pre-orders Balanced had processed.

64.     Finally, as discussed above, on January 10, 2017, the Debtor announced a wind-down and the refund of all outstanding pre-orders. As a part of the refund, the Debtor asked Stripe to refund all pre-orders—for both its customers and Balanced's customers—for which this was possible through the original credit card. Stripe initiated this process but notified the Debtor that it was suspending further refunds before the process was completed, upon learning of the San Francisco District Attorney's action and the potential of a bankruptcy proceeding.

65.     As of the time of the filing, the Company has not completed the process of reconciling customer refund information.  Once this reconciliation is complete, we will have a comprehensive analysis of the completed refunds, customer accounts which have not been refunded, and amounts remaining to fund the refunds.  Preliminarily, Tilt has represented to the Debtor that they hold approximately $3.6 million in funds for customer refunds.  Stripe has represented to the Debtor that they hold approximately $8.4 million in funds for the customer pre-orders.  Stipe has requested authority to continue refunds to those customers for whom they have valid credit card information.  The Debtor intends to file a motion early in the chapter 11 case to seek that authority and continue the refund process quickly and efficiently.  Subject to final verification, between the balances held by the Debtor, Tilt, and Stripe, we believe that there are adequate funds to complete refunds of customer pre-orders and that the customer pre-order funds are fully accounted for.

66.     At the time of the filing, we have not been able to determine how difficult it will be to make refunds to pre-order customers for whom there is no longer valid credit card information.  We understand that in some cases valid contact information in the form of email addresses are available from the original pre-order information.  In other cases, this is not available.  It is possible that some portion of these customers cannot be contacted and cannot be refunded.

## VI.     THE DEBTOR'S GOAL IN THIS CHAPTER 11 CASE

67.     The Debtor has several principal goals here.  First, the Debtor intends to complete a quick and orderly refund process by working hand in hand with its partners at Stripe and Tilt.

To complete the refund process, the Debtor intends to file a motion within a short period of time requesting a comfort order from the Court authorizing the refund process.[8]

68.     Second, the Debtor will pursue a competitive auction and work to close a sale transaction.  The Debtor intends to file a sale procedures motion shortly after the Petition Date to initiate that process.  The Debtor has received indications of interest from a number of potential buyers of its intellectual property portfolio and believes that its planned 363 sale will realize value from the portfolio.  Due to the potential loss of value to the IP if it goes stale, the Debtor hopes to expedite the closing of any transaction.

69.     Finally, the Debtor will seek to complete an orderly wind-down of its estate—while facilitating quick and efficient customer refunds—in an effort to maximize the value of the Debtor's business and assets for the benefit of all stakeholders.

70.     To ensure that its assets realize a maximum return from a transaction, the Debtor believes that it must maintain certain operations as it winds down.  Consequently, to ensure that the Debtor's operations are not disrupted, the Debtor is filing certain motions contemporaneously with this Declaration, the supporting facts of which and relief requested in each are set forth below.  I have reviewed these motions and confirm that the facts set forth therein are true and correct to the best of my knowledge and belief.

## VII.    FIRST DAY RELIEF

### A.      Claims Agent Motion

71.     Through the *Application of the Debtor for Entry of an Order Pursuant to 28 U.S.C. § 156(c) Approving the Retention and Appointment of Prime Clerk LLC As The Claims and Noticing Agent to the Debtor, Effective* Nunc Pro Tunc *to the Petition Date*, the Debtor seeks

---

[8]     The Debtor will file a motion seeking authority to continue refunding customers shortly after the Petition Date. The failure to file such motion is a deemed an "event of default" under the Cash Collateral Motion (discussed in Section VII.F).

the Court's appointment of Prime Clerk LLC to serve as claims and noticing agent and to assist with the administration of this chapter 11 case.  The proposed services that Prime Clerk will provide are set forth in the agreement attached as <u>Exhibit C</u> to the motion.

72.     We believe that there are more than 25,000 parties in interest including unrefunded pre-order customers, creditors, employees, stockholders, contract counterparties and other entities that will be included on the Debtor's creditor matrix submitted to the Court in this chapter 11 case; currently, the matrix has only non-customer entities because the Debtor is in the process of collecting customer information and determining the confidentiality provisions governing such information.

73.     In view of the number of parties in interest, the Debtor believes that retention of a claims and noticing agent will facilitate administration of the bankruptcy case, including in the distribution of notices and the processing of claims.  The Debtor, through its representatives, solicited and reviewed engagement proposals from two other claims and noticing agents, all of which are listed on the Court's list of claims agencies posted on its website at: http://www.deb.uscourts.gov/ClaimsAgents/ClaimsAgents.aspx.

74.     After evaluation and competitive comparison of the three proposals, the Debtor selected Prime Clerk and determined that Prime Clerk's proposal constitutes the most cost-effective and best proposal in view of the circumstances underlying this bankruptcy case and the Debtor's needs for noticing and claims management therein.

75.     Prime Clerk requested, and the Debtor agreed, to pay a retainer of $25,000 to cover a portion Prime Clerk's initial fees and costs, as identified in the agreement attached as <u>Exhibit C</u> to the motion.

76.     The Debtor believes that appointment of Prime Clerk will facilitate administration

of the bankruptcy case in a cost-effective manner and alleviate the burden on the Clerk of the

Court.

**B.      Cash Management Motion**

77.     Through the *Motion Of The Debtor For Entry of Interim and Final Orders*

*(A) Authorizing the Continued Use of Its Existing Cash Management System, Including*

*Maintenance of Bank Accounts and Existing Business Forms and Checks; and (B) Waiving*

*Certain U.S. Trustee Requirements and the Requirements of 11 U.S.C. § 345(b)*, the Debtor seeks

the entry of interim and final orders authorizing the Debtor to continue use of its existing bank

accounts, cash management systems, and business forms and to pay any outstanding pre-petition

bank fees that the Debtor becomes aware of, up to $1,000 in the aggregate.

**i.      The Debtor's Bank Accounts**

78.     The Debtor utilizes a centralized cash management system designed to collect,

transfer, and disburse funds generated from investors, the Loan and Security Agreement, and

customer pre-orders remitted from Tilt (the "Cash Management System").  The bank accounts

used in connection with the Cash Management System (collectively, the "Bank Accounts") are

listed on Exhibit 1 to the interim order attached to the Cash Management Motion.

79.     With respect to the Debtor's operations, the Cash Management System includes

five[9] Bank Accounts described as follows: (i) a zero-balance transactional account with SVB (the

"Operational Account") through which customer pre-order funds are received and/or transferred

back to Tilt and Stripe for refund purposes; (ii) a sweep account with SVB which has a current

balance of approximately $6.6 million, into which funds from the Operational Account are

---

[9]    Note, the Debtor also holds an additional checking account with SVB that has a $0 balance that was opened in
connection to a potential venture that never came to fruition.

transferred and in turn from which transfers out of the Operational Account are funded; (iii) a zero-balance transactional account with SVB (the "Payment Account") through which funds have been received from investors and through which funds are disbursed for payments to SVB for interest expense and principal payments on the Loan and Security Agreement, payments to vendors and suppliers, including the Debtor's payroll servicer, Sequoia One and other operational expenses; (iv) a sweep account with SVB which has a current balance of approximately $104,000, from which funds to pay the Payment Account are held until transferred to pay operations, and (v) one checking account with Wells Fargo Bank with a balance of approximately $500, maintained solely to facilitate the record keeping function of the Debtor. The Debtor used the Wells Fargo account prior to transferring its banking operations to SVB.

80.    I am informed that SVB and Wells Fargo are each parties to a Uniform Depository Agreement with the Office of the United States Trustee for the District of Delaware.

### ii.    Business Forms.

81.    In the ordinary course of business, the Debtor uses numerous business forms.  To minimize the expense to the estate and to avoid any confusion with customers, employees, and third parties, the Debtor respectfully requests authorization to continue using all business forms, including without limitation, checks, letterhead, customer program forms, and contracts, as those forms were used by the Debtor immediately prior to the Petition Date, without reference to the Debtor's status as a debtor-in-possession.  Granting this relief will allow the Debtor to avoid the costs and delays of ordering new business forms.  Upon depletion of the current stock of forms and checks, the Debtor will obtain new checks and forms that indicate the debtor-in-possession status as consistent with Local Rule 2015-2(a).

C.    **Employee Obligations Motion**

82.    Through the *Motion of the Debtor for Entry of Interim and Final Orders Authorizing (A) the Debtor to Honor Prepetition Employee Wages, and Contributions to Employee Programs; (B) the Debtor to Continue Employee Programs in the Ordinary Course of Business; and (C) the Debtor, Banks, and Other Financial Institutions to Comply with Procedures Relating Thereto*, the Debtor seeks the entry of interim and final orders (A) authorizing, but not requiring, the Debtor to continue and honor its prepetition employee obligations and practices, by, among other things, (i) continuing its practice of reimbursing reasonable, approved employee expenses, (ii) continuing its employee compensation practices, including honoring prepetition ordinary and customary wages and salaries in an amount up to $9,000 in the aggregate, (iii) continuing to pay federal and state withholding taxes and payroll taxes, including by paying any prepetition amounts, (iv) continuing to pay administrative fees related to the benefits and programs, including prepetition administrative fees in an amount up to $100 in the aggregate, (v) continuing to compensate, and reimburse expenses of, its independent director, including by paying up to $5,000 in the aggregate on account of prepetition compensation,  and (vi) honoring all other employee benefits the Debtor provides in the ordinary course of its business, including paid sick leave (collectively, the "Wage Obligations"); (B) authorizing, but not requiring, the Debtor to continue its employee benefits programs (collectively, the "Employee Programs" and together with the Wage Obligations, the "Employee Obligations"); and (C) authorizing banks and other financial institutions, including Sequoia One, to receive, process, honor, and pay checks or fund transfers presented for payment by the Employees and to comply with procedures and honor all checks and fund transfer requests made by the Debtor relating to the Employee Obligations.

#### i.    Debtor's Workforce

83.    The Debtor currently employs two at-will full-time employees and one

contractual employee.   The two operating employees are the Debtor's founders and currently

fulfill technology, customer service, and business operation functions (the "Operating

Employees").  The third is the Debtor's independent director, Spencer Wells.

84.    Each of the Debtor's employees is essential to effectuating the orderly

administration of the bankruptcy case.  The Debtor's remaining employees have distinct

experience and expertise that are vital to the wind-down process.

#### ii.    Wage Obligations

85.    The Debtor pays its two full time employees on a semi-monthly basis, including

wages and salaries. The total is estimated to be approximately $9,000 per period.  Payroll

payments are made via direct deposit through electronic transfer of funds directly to the

employees or via check.

86.    Additionally, the Debtor pays Mr. Wells, as Independent Director, a monthly

salary.  The Debtor pays Mr. Wells $20,000 per month for the first three months of his

employment.  He will receive $17,500 for the following three months and $15,000 per month

thereafter.

87.    For the Operating Employees, the Debtor utilizes Sequoia One, a human

resources solutions provider, to process employee payroll, withholdings and deductions. Sequoia

One typically debits the Debtor's Payment Account in the amount of the applicable payroll,

which includes a processing fee, one or two business day before employees are scheduled to be

paid. Sequoia One then issues payment directly to the employees.

88.    As of the Petition Date, the Debtor estimates $9,000 in the aggregate is owed to

the Operating Employees for pre-petition wages.  These wages are scheduled to be paid on

February 28, 2017, which requires Sequoia One to debit the Debtor's bank account on approximately February 27, 2017. The Debtor requests authority to pay the Operating Employees for these pre-petition Wage Obligations.

89.     Mr. Wells' wages are scheduled to be paid on the first of every month, which requires the Chief Restructuring Officer to debit the Debtor's bank account on the same day of payment.  As of the Petition Date, the Debtor estimates $5,000 in the aggregate is owed to Mr. Wells for pre-petition wages related to the last week of February.  The Debtor's next payment of $20,000 is due to Mr. Wells on March 1.

90.     The Debtor withholds from each Operating Employee's wages amounts related to, among other things, federal, state and local income taxes, social security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities. The Debtor then matches from its own funds social security and Medicare taxes and pays, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance.

91.     Payroll taxes are processed by Sequoia One and forwarded to the appropriate federal, state, or local taxing authorities at the same time employee payroll is administered.  The Debtor pays Sequoia One a fee of $49.00 per Operating Employee for its payroll services per pay period.

92.     The Debtor requests authority to pay Sequoia One, up to $100 in the aggregate, for these pre-petition payroll services related to the upcoming pay period that requires Sequoia One to debit the Debtor's bank account on February 27, 2017.

### iii.    Other Programs

93.     The Debtor directly or indirectly reimburses employees for certain approved expenses incurred on behalf of the Debtor in the scope of their employment for business-related travel, business-related meals, and other business-related expenses.  The Debtor permits each

employee to use his own personal credit card for such expenses for which the Debtor reimburses the employee. As of the Petition Date, there were no outstanding reimbursable expenses.

94.     In the ordinary course, the Debtor has an unlimited "no-accrual" paid-time-off program. Therefore, there are no outstanding prepetition obligations related to paid-time-off.

### iv.     Employee Benefits

### a.     Health Benefit Plans

95.      Partnering with certain carriers, Anthem Blue Cross and Kaiser are the sponsors of the Debtor's medical benefit plans and Guardian is the sponsor of the Debtor's dental and vision benefit plans.

96.     Generally, the Debtor funds up to 50% of premiums for medical and 50% of premiums for dental coverage of each Operating Employee. In addition, the Debtor generally funds up to 50% of premiums for medical coverage for each employee's spouse and dependent(s), up to 50% of premiums for dental coverage for each employee's spouse and up to 50% of premiums for dental coverage for each employee's dependent(s). An optional pre-tax flexible spending account is also available to employees, at their expense, for eligible out-of-pocket health care and dependent expenses.

97.     The Debtor is current on all of its pre-petition obligations related to the Debtor's health benefit plans.

### b.     Insurance

98.     The Debtor, through Guardian offers Operating Employees basic life insurance. In addition, the Debtor maintains workers' compensation policies to provide its employees with compensation for injuries arising from or related to their employment with the Debtor. The Debtor pays for basic life insurance coverage up to $250,000 per employee. In addition, the Debtor provides long-term disability insurance for qualifying disabilities per month. Employees

27

also are provided the option to elect supplemental life, Accidental Death and Dismemberment, and disability insurance.

99.    The Debtor maintains a directors' and officers' liability insurance plan through QBE Specialty Insurance Company.  All premiums for this D&O policy have been paid through February 3, 2018.

### c.    Additional Benefits

100.    The Debtor offers additional benefit programs to the Operating Employees, including a 401(k) plan provided through ForUsAll, which is not administered by the Debtor, a pre-tax commuter benefit plan and other services.

### D.    Utilities Motion

101.    Through the *Motion of the Debtor For Interim and Final Orders (A) Prohibiting Utilities From Altering, Refusing, or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures For Determining Adequate Assurance of Payment*, the Debtor seeks the entry of interim and final orders (a) prohibiting its utility providers from (i) altering, refusing, or discontinuing utility services to, or discriminating against, the Debtor on account of any outstanding amounts for services rendered pre-petition or (ii) drawing upon any existing security deposit, surety bond, or other form of security to secure future payment for utility services; (b) determining that adequate assurance of payment for post-petition utility services has been furnished to the utility providers; and (c) establishing procedures for resolving future requests by any utility company for additional adequate assurance of payment.

### i.    Utility Providers

102.    In connection with the operation of its business, the Debtor incurs utility expenses in the ordinary course of business for, among other things, phone, electricity, gas and internet

(collectively, the "Utility Services").  On a monthly basis, the Debtor spends approximately $4,700 for the Utility Services.  A list of the companies providing the Utility Services is attached as Exhibit A to the Utilities Motion.

103.    The Debtor believes that it is current with its Utility Services although there may be situations in which payment was not yet due on the Petition Date or where a Utility Service provider has provided services in which the normal monthly bill had not yet been issued on the Petition Date.  The Debtor believes that such pre-petition obligations, if any, are minimal.

### ii.    Adequate Assurance Deposit

104.    The Debtor intends to pay all post-petition obligations owed to the Utility Providers in a timely manner, consistent with the ordinary course of operating its business post-petition.  However, to provide adequate assurance of payment for future services, the Debtor proposes to deposit an initial sum equal to 50% of the Debtor's estimated average monthly cost of Utility Services (the "Adequate Assurance Deposit") based on the twelve-month period preceding the Petition Date into an interest-bearing, newly-created, segregated account within twenty (20) days of the Petition Date, pending further order of this Court.  Because the Debtor's approximate monthly spending on Utility Services for the respective twelve-month period preceding the Petition Date is $4,703.74, the total Adequate Assurance Deposit will be $2,351.88, with amounts allocated to each Utility Service as set forth on Exhibit A to the Utilities Motion.

105.    The Debtor proposes to maintain the Adequate Assurance Account with a minimum balance equal to 50% of the Debtor's estimated average monthly cost of Utility Services through the final hearing on the Motion.  Thereafter, the Debtor proposes to adjust the amount in the Adequate Assurance Account to reflect the following factors: (i) the termination of Utility Services by the Debtor regardless of any Additional Assurance Requests (as defined

below), and (ii) agreements with the Utility Providers. These adjustments will permit the Debtor to maintain the Adequate Assurance Account with an amount that consistently provides the Utility Providers that do not otherwise hold deposits or security for its Utility Services with a half-monthly deposit on account of such services.

106.    The Debtor submits that the Adequate Assurance Deposit, taken together with the facts and circumstances of the Debtor's chapter 11 case, constitutes sufficient adequate assurance to the Utility Providers. Specifically, the Debtor's available cash is more than adequate to meet its cash needs during this case and the Debtor requires uninterrupted use of its Utility Services to preserve its going concern value. As a result, the Debtor is very likely to continue paying its obligations to the Utility Providers post-petition.

107.    These protections ensure that all Utility Providers will have adequate assurance of payment throughout this case, and the Debtor believes that no other or further assurance is necessary.

**E.    Taxes Motion**

108.    Through the *Motion Of The Debtor For Entry Of Interim And Final Orders Authorizing the Debtor To Pay Certain Prepetition Taxes And Fees*, the Debtor requests entry of interim and final orders, authorizing, but not directing, the Debtor to pay prepetition taxes to the respective taxing authorities, and to continue paying taxes to the taxing authorities post-petition in the ordinary course.

109.    Prior to the Petition Date, the Debtor in its ordinary course of business, incurred various taxes, including, without limitation, state and local sales and use tax liabilities. The Debtor estimates that  approximately $600 is owed to taxing authorities as of the Petition Date or will come due shortly after the Petition Date. As of the Petition Date, the Debtor's financial

records indicate that $600 in taxes have accrued prepetition but will not become payable to the applicable taxing authorities until after the Petition Date.

110.    The Debtor believes the continued payment of the taxes on their normal due dates will ultimately preserve the resources of the Debtor's estate, thereby creating a greater recovery for creditors and stakeholders.

**F.    Cash Collateral Motion**

111.    Through the *Motion of the Debtor For Interim Order Pursuant To 11 U.S.C. §§ 361 and 363: (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling Further Interim Hearing, and (IV) Granting Related Relief*, the Debtor seeks, among other things, authorization to use the cash collateral of Spark Capital as successor in interest to SVB (the "Prepetition Secured Lender"), on an interim basis.

112.    The relief sought in this motion is essential because the orderly continuation of the Debtor's wind down and its process to return customer payments depends largely upon its ability to regularly use cash collateral. The Prepetition Secured Lender consents to the Debtor's use of the cash collateral in exchange for the adequate protection described in the motion. The Debtor's access to cash collateral is necessary to preserve and maximize value for the benefit of all of the Debtor's stakeholders.

**G.    DIP Motion**

113.    Through the *Motion of the Debtor for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2 (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Granting Liens and Providing Super-Priority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, the Debtor seeks to secure the liquidity

necessary to administer this chapter 11 case and continue the wind down of its business operations.

114.    The Debtor requests,[10] among other things, authorization to obtain a super-priority postpetition financing consisting of a term loan in a principal amount of up to $3,027,000.00 (the "DIP Facility"). The terms of the DIP Facility are set forth in the term sheet attached to the motion. The Debtor may only draw upon the DIP Facility following the execution of mutually acceptable loan documentation, and the entry of an interim order in a form reasonably acceptable to SVB approving the DIP Facility and the related loan documents.  Additionally, the Debtor requests authorization to use cash collateral as necessary and as provided in the budget during the course of the chapter 11 case.

115.    The Debtor has been unable to obtain any of the following: (1) unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, (2) credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code,  (3) credit for money borrowed secured solely by a lien on property of the estate that is not otherwise subject to a lien, or (4) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien, in each case, on more favorable terms and conditions than those provided in the DIP Facility and set forth in the motion.  The DIP Facility provides the financing necessary to provide the Debtor sufficient liquidity to operate this chapter 11 as it advances its sale efforts. Absent the DIP Facility, the Debtor would lack the capital needed to fund this case and orderly wind down its operations.

---

[10]    Although the Debtor filed the DIP Motion on the Petition Date, it is not requesting relief on the DIP Motion be entered at the First Day Hearing.

116.    I am familiar with the terms of the DIP Facility and the proposed adequate protection.  Based on my general experience in the restructuring industry and my experience with the Debtor's business, I believe that interim approval of the DIP Facility is necessary and appropriate to allow the Debtor access to liquidity.  I worked closely with the Debtor's management team and advisors to develop a budget and to determine the amount of interim funding required to meet the Debtor's short-term liquidity needs pending approval of the motion on a final basis.  Access to cash collateral will provide the Debtor with sufficient liquidity to assure its remaining employees, professionals and third-parties that the Debtor has the capital necessary to fund the case and wind down operations.

117.    The Debtor is nearly out of cash and is winding down operations.  Therefore, the chapter 11 filing-related expenses and the need to properly wind down the Company, while advancing sale efforts and issuing customer refunds, will require the new financing embodied in the DIP loan.  Access to cash collateral and the interim financing under the DIP Facility is essential to the Debtor's ability to avoid irreparable harm to its assets as it winds down.

118.    In seeking financing, the Debtor was cognizant of the challenges presented by the fact that substantially all of the Debtor's assets are encumbered by the Prepetition Secured Lender.  SVB presented the best option for financing. The Debtor and SVB negotiated terms in good faith and the Debtor has determined that the DIP Facility is the best source of financing currently available to the Debtor.

119.    I believe that the DIP Facility, together with consent to use cash collateral, will provide access to capital on terms that, collectively, are the best and most favorable terms available to the Debtor.  The DIP Facility is the only realistic financing available to the Debtor

under the circumstances and is absolutely essential to the Debtor's ability to administer its chapter 11 case.

120.     Approval of the motion provides the Debtor sufficient liquidity to administer this chapter 11 case as it advances its sale efforts.  Absent the DIP Facility and access to cash collateral, the Debtor would lack the capital needed to fund this case and orderly wind down its operations.

## VIII.   CONCLUSION

121.     This Declaration describes the factors that have precipitated in the commencement of this chapter 11 case and demonstrates the need for the Debtor to obtain the relief requested in the First Day Motions.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.


Dated: February 27, 2017

                                        Respectfully submitted,


                                        *Curtis G. Solsvig, III*
                                        _____
                                        Curtis G. Solsvig, III
                                        Chief Restructuring Officer, subject to Court
                                        approval